## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Entitled Action Pending in U.S.D.C. Northern District of Florida**
**Case No.: 4:21-cv-00187-MAF**

| | |
|---|---|
| FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, COMMON CAUSE, and DISABILITY RIGHTS FLORIDA, et al., | |
| Plaintiffs, | |
| v. | Misc. Case No. |
| LAUREL M. LEE, | |
| in her official capacity as Florida Secretary of State, et al., | |
| Defendants, | |
| REPUBLICAN NATIONAL COMMITTEE and NATIONAL REPUBLICAN SENATORIAL COMMITTEE, | |
| Intervenor-Defendants. | |

<u>**PLAINTIFFS' MOTION TO COMPEL**</u>
<u>**NON-PARTIES THE HERITAGE FOUNDATION AND HERITAGE**</u>
<u>**ACTION FOR AMERICA TO COMPLY WITH THIRD-PARTY**</u>
<u>**SUBPOENAS TO PRODUCE DOCUMENTS PURSUANT TO FED.**</u>
<u>**R. CIV. P. 37 and 45**</u>

Plaintiffs Florida State Conference of Branches and Youth Units of the NAACP, Common Cause, and Disability Rights Florida (jointly, "Plaintiffs"), by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 37 and 45, hereby move to compel The Heritage Foundation and Heritage Action for America (jointly, "Heritage") to produce a subset of documents responsive to the third-party subpoenas that Plaintiffs served on August 6, 2021, in *Florida State Conference of Branches and Youth Units of the NAACP, et al. v. Laurel M. Lee, et al.*, No. 4:21-cv-00187 (N.D. Fla.) (the "Underlying Case"), the above-captioned case pending in the United States District Court for the Northern District of Florida.  This Motion is brought in this Court pursuant to Fed. R. Civ. P. 45(b)(2), which states that the party that serves a subpoena "may move the court *for the district where compliance is required* for an order compelling production or inspection." (emphasis added).  Here, the subpoenas called for documents to be produced electronically, with anything that could not be produced electronically to be produced to the office address of Plaintiffs' local counsel in West Palm Beach, Florida.

Plaintiffs specifically seek an order requiring Heritage to produce to Plaintiffs all documents responsive to Plaintiffs' subpoenas that are, or reflect, communications to or from Heritage and to or from any government officials or their staff, acting in their official capacity, from January 1, 2019.  In support thereof, Plaintiffs state as follows:

1. Pursuant to an order of the court in the Underlying Case entered on July 23, 2021, the deadline for completing discovery in the Underlying Case is October 22, 2021. Ex. B.

2. On August 6, 2021, Plaintiffs served Heritage with third-party subpoenas requesting documents pursuant to Fed R. Civ. P. 45.  Exs. C and D.

3. On August 27, 2021, counsel for Heritage, Heidi K. Abegg, requested an extension to reply to the subpoena, a request which Plaintiffs granted.  Ex. E.

4. On September 7, 2021, Heritage served Plaintiffs with Objections to the Rule 45 subpoenas.  Heritage categorically objected to Plaintiffs' requests and refused to produce any documents.  Ex. F.

5. Plaintiffs' counsel and Heritage's counsel have met and conferred in an attempt to obtain the requested documents from Heritage.  To date, those efforts has been unsuccessful.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an Order compelling Heritage to produce a subset of documents requested in their August 5, 2021 subpoenas: specifically, responsive communications to or from Heritage and any government officials or their staff, acting in their official capacity, from January 1, 2019 to the present.[1]

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION

Pursuant to Rules 37 and 45 of the Federal Rules of Civil Procedure and Local Rule 26.1(g) of the Local Rules of the United States District Court for the Southern District of Florida,  Plaintiffs in the Underlying Case seek to compel Heritage to produce documents responsive to the third-party subpoenas that Plaintiffs served on August 6, 2021.[2] Plaintiffs' subpoenas seek a targeted set of documents regarding Heritage's involvement in the passage of Senate Bill 90, An Act Relating to Elections, 2021 Fla. Sess. Law Serv. ch. 2020-11 (West) ("SB 90").  Heritage's refusal to produce *any* documents in response to Plaintiffs' subpoenas is not justified.  The subpoenas seek relevant documents, do not infringe upon any First Amendment associational privilege, are proportional to the needs of the case, and are neither overbroad or unduly burdensome.

---

[1] Due to the impending discovery deadlines and the expedited schedule in this election-related matter, Plaintiffs believe that oral argument is not necessary and that this Court should rule on this motion on the papers.

[2] In its motion, Plaintiffs seek a narrower subset of requests than those made in the original subpoenas to Heritage.  Specifically, Plaintiffs seek responsive communications to or from Heritage, and to or from any government officials or their staff, acting in their official capacity, from January 1, 2019 to the present.  Plaintiffs do not seek any internal communications among Heritage staff, or between Heritage and its private-citizen members.

## BACKGROUND

The subpoenas to Heritage seek key evidence relevant to the Underlying Case, a civil action pending in the Northern District of Florida.  In that case, Plaintiffs challenge several provisions of SB 90, enacted in Florida on May 6, 2021.  Although Florida Secretary of State Laurel M. Lee publicly heralded the 2020 election as "safe, secure, and orderly,"[3] the Florida Legislature rushed to restrict voting rights by passing SB 90.[4]  As publicly reported in the media and confirmed by certain documents obtained in discovery by Plaintiffs in the Underlying Case (and in certain cases consolidated for discovery purposes with the Underlying Case), Heritage was intimately involved in meeting, conferring, and strategizing with key Florida legislators about SB 90.  Plaintiffs served document subpoenas on Heritage because these communications provide evidence about SB 90's purpose and impact, and about the drafting and legislative process leading up to SB 90's enactment.

SB 90 features provisions designed to cut off voters from critical resources, such as ballot drop boxes, that facilitated voter participation in the 2020 elections.[5]  In enacting SB 90, the State also sought to hinder the efforts of organizations and individuals attempting to mobilize voters by limiting their ability to assist in the collection and delivery of vote-by-mail ballots, and provide assistance to voters standing in line to vote.[6]  None of these restrictions are justified by a countervailing state interest.[7]  SB 90's new restrictive regime took effect immediately upon being signed by Governor Ron DeSantis on May 6, 2021.[8]

---

[3] Ex. A, at ¶ 2.

[4] *Id.* at ¶¶ 53–73.

[5] *Id.* at ¶¶ 74–84, 93–96

[6] *Id.* at ¶¶ 85–114.

[7] *Id.* at ¶¶ 115–124.

[8] *Id.* at ¶¶ 71, 73.

The hurried legislative process that led to SB 90's enactment was marked by extraordinary procedural deviations from the ordinary legislative process in Florida.[9] The public was largely excluded from the process.[10]  Lobbyists and activists from Heritage, however, played a crucial role.[11]

Plaintiffs commenced the Underlying Case in the Northern District of Florida on the day SB 90 was enacted, seeking declaratory and injunctive relief to block several provisions (the "Challenged Provisions") from being enforced.  Plaintiffs' operative Complaint alleges that the Challenged Provisions unreasonably and unjustifiably burden the right to vote, in violation of the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution; Section 2 of the Voting Rights Act; and Title II of the Americans With Disabilities Act.  Plaintiffs' operative Complaint specifically alleges, among other things, that the Challenged Provisions intentionally discriminate based on race,[12] and that the Challenged Provisions create discriminatory results,[13] unduly burden the right to vote,[14] fail to provide reasonable accommodations for voters with disabilities,[15] and violate the First Amendment.[16]

In accordance with the expedited schedule set by the Court in the time-sensitive election case,[17] Plaintiffs have diligently pursued both party and non-party discovery under the Federal Rules of Civil Procedure, supplemented by public records requests made under Florida state law.  On August 6, 2021, Plaintiffs served subpoenas for

---

[9] *Id.* at ¶¶ 53–73.

[10] *Id.* at ¶ 71.

[11] *See infra*, at 8.

[12] Ex. A, at ¶¶ 186–223.

[13] *Id.* at ¶¶ 125–141.

[14]  *Id.* at ¶¶ 141–151.

[15] *Id.* at ¶¶ 152–166.

[16] *Id.* at ¶¶ 167–176.

[17] *See* Ex. B at 2.

documents on The Heritage Foundation[18] and its lobbying arm, Heritage Action for America ("HAFA").[19]   The subpoenas sought a narrow set of highly relevant records regarding Heritage's involvement with the passage of SB 90 and similar legislation including: (1) documents and communications relating to the rationale for enacting SB 90 or similar legislation; (2) documents and communications with Governor DeSantis relating to SB 90 or similar legislation; (3) documents and communications with members of the Florida Legislature relating to SB 90 or similar legislation; (4) documents and communications related to Heritage's lobbying to address election reform, election security, or voter fraud in the 2020 general election, and (5) documents and communications assessing the potential impact of SB 90 or similar legislation.[20] Plaintiffs' request is now narrower: Plaintiffs seek an order compelling Heritage to produce responsive communications to or from Heritage, and to or from any government officials or their staff, acting in their official capacity, from January 1, 2019 to the present. Plaintiffs are not seeking any internal communications among Heritage staff, or between Heritage and its private-citizen members.

More than three weeks after serving the subpoena, on August 27, 2021, Heritage's counsel indicated she had been on vacation and had just received the subpoena. Following a telephonic meet-and-confer a few days later, Plaintiffs granted Heritage an extension of time to respond to the subpoenas and offered to limit the date range for the requested documents to January 1, 2019 onward, stating:

> We also agree to an extension for both Heritage [entities'] responses to our subpoenas from September 7 to September 14, provided rolling document productions begin during that time period.  We request both of your clients substantially complete their document productions by September 20 so that we have time to review and follow up before the close of discovery in this case.[21]

---

[18] *See* Ex. C.

[19] *See* Ex. D.

[20] *See* Exs. C and D.

[21] *See* Ex. E, dated September 1, 2021.

Plaintiffs also offered to meet and confer regarding search terms and custodians.

One week later, Heritage categorically objected to the subpoenas and refused to produce *any* documents. Both Heritage entities served written Objections contending that the requested information was (1) irrelevant to the suit; (2) protected under the First Amendment "associational privilege"; (3) not proportional to the needs of the case and could be more easily obtained through other means; and (4) overbroad and unduly burdensome.[22] In a telephonic meet-and-confer call on September 15, 2021, Heritage's counsel reiterated that Heritage was unwilling to produce *any* documents, regardless of any narrowing or identification of custodians or search terms. The parties agree that they are at an impasse.

On September 22, 2021, Plaintiffs filed a motion in the Underlying Case in the Northern District of Florida to compel Heritage to produce a subset of documents responsive to Plaintiffs' subpoenas.[23] On September 24, 2021, Chief Judge Walker denied the motion "without prejudice to refile in the appropriate district," citing Fed. R. Civ. P. 45(b)(2), which states that the party that serves a subpoena "may move the court *for the district where compliance is required* for an order compelling production or inspection." (emphasis added).[24] Here, the subpoenas called for documents to be produced electronically, with anything that could not be produced electronically to be produced to the office address of Plaintiffs' local counsel in West Palm Beach, Florida, which is located in the Southern District of Florida. Plaintiffs thus are moving this Court to enforce the subpoena.

Because Heritage's Objections to Plaintiffs' valid subpoenas are unsupportable, Plaintiffs respectfully ask the Court to compel the production of the subset of the documents sought in their subpoenas and identified above: responsive communications to or from Heritage, and to or from any government officials or their staff, acting in their official capacity, from January 1, 2019 to the present. Plaintiffs are not seeking any

---

[22] *See* Ex. F.

[23] *See* Ex. G.

[24] Ex. H, at 3.

internal communications among Heritage staff, or between Heritage and its private-citizen members.

ARGUMENT

Permissible discovery extends to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). A party seeking discovery through the use of a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subjected to the subpoena." Fed. R. Civ. P. 45(d)(1). In discovery, courts are "bound to adhere to the liberal spirit of the Federal Rules." *Adkins v. Christie*, 488 F.3d. 1324, 1331 (11th Cir. 2007) (internal quotations omitted). Therefore, the party seeking to withhold requested information—in this instance, Heritage—bears the burden of persuasion when moving to quash a subpoena or obtain a protective order. *See Goodman-Gable-Gould Co., Inc. v. Tiara Condominium Assoc., Inc.*, 2007 WL 9701863, at *3 (S.D. Fla. Mar. 30, 2007). Here, Plaintiffs' subpoenas are proper under both Rule 26 and Rule 45, and Heritage's total refusal to comply with its obligations should be rejected.

## I.   Heritage Possesses Documents Relevant to the Core Issues in the Action.

Plaintiffs' subpoenas to Heritage seek a targeted set of highly relevant records bearing directly on Plaintiffs' claims and Defendants' arguments in the litigation. Heritage was extensively involved in pushing for state legislation to restrict voting rights, including with respect to SB 90. The specifics of its activities and interactions with Florida legislators and Florida's governor leading up to SB 90's passage and enactment are thus highly salient. For example, documents responsive to the subpoenas could shed light on the motives of the Legislature in enacting SB 90; reveal SB 90 proponents' understanding of the bill's likely impact on voters generally and on protected sub-groups of voters; provide evidence of intentional discrimination or motivations to discriminate (*e.g.*, Ex. A, First Amended Compl., ECF No. 45, Underlying Case ("FAC") ¶¶ 186–223); and illuminate whether the State's proffered "interests" in passing SB 90 were pretextual (*e.g.*, FAC ¶¶ 49–51).

Heritage claims that the information sought is irrelevant "to any subject matter involved in the pending action" and further contends that "the relevance standard is more

7

exacting" when a claim of associational privilege is asserted.[25]   As explained below, Heritage cannot meet its burden of pleading a *prima facie* case for the associational privilege as applied in the context of Plaintiffs' requests.  Further, regardless of whether a more "exacting" standard of relevance is applied, the documents requested are material to Plaintiffs' allegations—namely the intent and knowledge of the Florida Legislature—and therefore must be produced.

The public record and the documents that have been disclosed to date both indicate that Heritage possesses information relevant to this lawsuit.  Heritage has publicly touted its involvement in pushing for restrictive voting legislation nationwide in the wake of the 2020 election.  The organization specifically targeted Florida.[26]  HAFA Executive Director Jessica Anderson stated that "[i]n some cases, [Heritage] actually draft[s] [the bills] for [the legislatures]."[27]  Representatives from HAFA also sought to have conversations about the "specifics of the bill" with State Representative Blaise Ingoglia—the sponsor of HB 7041, the companion voter-suppression bill to SB 90, in the Florida House of Representatives.[28]

---

[25] Ex. F, Heritage Objections at 1, 4.

[26] *Heavy Hand of Heritage Foundation Guides Florida's Election Overhaul*, South Florida Sun-Sentinel, March 30, 2021, https://www.sun-sentinel.com/opinion/editorials/fl-op-edit-florida-voting-restrictions-heritage-foundation-20210330-63jys5nxmnhw5j3zqvgowhpqi4-story.html ("Heritage Action officials have confirmed to the *Sun Sentinel* editorial board that the group is working with Florida's legislators.").

[27] Ari Berman & Nick Surge, *Leaked Video: Dark Money Group Brags About Writing GOP Voter Suppression Bills Across the Country*, Mother Jones, May 13, 2021, https://www.motherjones.com/politics/2021/05/heritage-foundation-dark-money-voter-suppression-laws/.

[28] Ex. I, April 1, 2021 Email from Karen Jaroch to "Blaise for Florida"; Lobbyist Disclosure & Information, https://myfloridahouse.gov/LD/default.aspx?pn=Heritage+Action+for+America&lyi=8&tci=-1 (showing Heritage Action for America's lobbying regarding "election integrity" in SB 90 and HB 7041); *see also* Fla. *Registered Legislative Branch Lobbyist Directory: 2021 Registrations by Lobbyist Name*, at 256, https://www.floridalobbyist.gov/reports/Lobbyist_LEG_2021.pdf (listing lobbyist for HAFA, with effective date of Mar. 10, 2021).

The information sought from Heritage thus goes to fundamental elements of Plaintiffs' claims that the Florida Legislature acted with racially discriminatory intent when passing SB 90, and that the state's purported "fraud-prevention" justification for the law was pretextual.  FAC ¶ 218.  Materials prepared and conveyed to Representative Ingoglia, who sponsored HB 7041, bear on Representative Ingoglia's, and in turn the Florida Legislature's, intent in passing the bill.  Regardless of whether Heritage in fact drafted the legislation in whole or in part, Heritage's knowledge and intent is probative of the Florida Legislature's intent, and potentially also legislators' understanding of the intended or predictable effects of the legislation on voters.  In the context of Plaintiffs' claims that SB 90 has the effect of discriminating on the basis of race and disability, and was intended to discriminate on the basis of race, Heritage's input into the legislation— whether in the form of proposed legislative text or in the form of its correspondence with the bill's key sponsors and supporters—cannot be shielded from disclosure.

It is also important to understand whether, and to what extent, legislators who supported SB 90 relied on Heritage for their assertions that provisions in SB 90 are meant to "increase election security" and combat voter fraud in Florida.[29]  Heritage is well known for arguing that voter fraud is "a real and pressing issue that threatens the integrity of our voting process."[30]  Heritage maintains a prominent public database of all alleged incidents of voter fraud, which it touts as widespread evidence of misconduct.[31]  However, a Brennan Center for Justice analysis found that "a close review of [Heritage's] database

---

[29] Gray Rohrer, *Florida House Panel Moves Forward with Elections Bill Restricting Mail Ballots*, Orlando Sentinel, Mar. 22, 2021, https://www.orlandosentinel.com/politics/os-ne-election-law-changes-florida-20210322-jm4numirnvckzjvrbr4caqtbee-story.html.

[30] Anne Mulrooney, *'Heritage Foundation "Destroys" Claim That Voter Fraud Doesn't Happen'*, The Heritage Foundation, https://www.myheritage.org/news/heritage-foundation-destroys-claim-that-voter-fraud-doesnt-happen/.

[31] *Election Fraud Cases*, The Heritage Foundation, https://www.heritage.org/voterfraud/search.

reveals that it substantially inflates and exaggerates the occurrence of voter fraud."[32] Therefore, to the extent legislators relied on guidance or representations from Heritage in formulating their motivations for enacting SB 90, such communications are highly relevant to multiple issues in this case and to several of Plaintiffs' claims.

## II.   The First Amendment "Associational Privilege" Does Not Allow Heritage to Refuse to Produce All Documents in Response to Subpoenas.

Contrary to Heritage's contention,[33] the documents that Plaintiffs seek are not privileged under the First Amendment associational privilege. Plaintiffs do not seek to reveal the identities of any Heritage members or donors.  Rather, Plaintiffs seek information that may (among other things) furnish evidence of discriminatory intent by the Florida Legislature; of a pretextual motive undercutting the State's purported justification of "election security"; and of the Florida Legislature's intent and knowledge of potential impacts when passing SB 90.  Further, Heritage's touting of its position advocating for more restrictive voter laws undermines any argument that the information sought by Plaintiffs will chill Heritage's associational rights.  As Heritage itself admits in its Objections, "Heritage Action's position on election reform is already a matter of public record."[34]  Because production of the information sought would not "chill" Heritage's associational or free-expression rights, the associational privilege simply does not apply here.

"For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's evidence.  When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional."  *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996) (citations omitted).  The First Amendment associational privilege is one such *qualified*

---

[32] Rudy Mehrbani, *Heritage Fraud Database: An Assessment*, Brennan Ctr. for Justice (Sept. 8, 2017), https://www.brennancenter.org/sites/default/files/2019-07/Report_HeritageAnalysis_Final.pdf.

[33] *See* Ex. F, at 2.

[34] Ex. F, at 4.

10

exception.  The party asserting the privilege bears the burden of making a *prima facie* case showing an objectively reasonable probability that compelled disclosure will chill associational rights.  *In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1152–53 (D. Kan. 2010).  Even if a party successfully makes a *prima facie* showing, the party seeking disclosure is still entitled to discovery if it can demonstrate a "compelling need" for the information.  *Id.* at 1153.

The associational privilege "arises when a discovery request results in disclosure of a group's anonymous members, or requests similar information that goes to the heart of an organization's associational activities."  *NIACCF, Inc. v. Cold Stone Creamery, Inc.*, 2014 WL 4545918, *3 (S.D. Fla. Sept. 12, 2014).  The privilege also protects against compelled disclosure that would adversely affect an organization by "induc[ing] members to withdraw . . . and dissuad[ing] others from joining because of fear of exposure." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 463 (1958).  Associational privilege may also apply when disclosure would likely adversely affect an organization's ability "to pursue their collective effort to foster beliefs which they admittedly have the right to advocate."  *Id.* at 462–63.  In *NAACP v. Alabama*, the NAACP successfully invoked the privilege when the State of Alabama—then a segregationist stronghold—sought the release of the NAACP's membership lists.

The situation here could not be more different.  Plaintiffs are not seeking to unmask individual Heritage members.  Plaintiffs are not requesting Heritage's membership roster or its email list.  Plaintiffs are not seeking any information on Heritage's donors or finances.  Nor are Plaintiffs seeking to compel the disclosure of internal Heritage communications.  The subpoenas do not request the disclosure of any documents that, if shared, would "induce [Heritage] members to withdraw" or "dissuade others from joining for fear of exposure."  *Id.*  As Heritage itself admits in its Objections, its "position on election reform is already a matter of public record."  Earlier this year, Heritage's own press releases promoted its work to "encourag[e] Florida lawmakers" to

enact "strong legislation" related to the state's election administration.[35]  As a result, Heritage's contention that Plaintiffs' requests would "chill" its First Amendment right to association is baseless.

Heritage's weak claim of associational privilege is particularly inapposite here.  By refusing to comply with the subpoenas on the basis of  purported First Amendment concerns, Heritage deprives Plaintiffs of evidence that could be central to vindicating another (and equally weighty) First Amendment right: the right to vote, and to have one's vote counted.  This argument is at the heart of Plaintiffs' operative Complaint in the Underlying Case (FAC ¶¶74–151), and it is well established that voters have a First Amendment right to vote without incurring unreasonable or unjustifiable burdens. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (voting rights are "precious in a free country," in part because they preserve all other rights).

## III.    Plaintiffs' Subpoenas Are Proportional to the Needs of the Case.

Plaintiffs' requests are also proportional to the needs of the case.  *See AbbVie Inc. v. Boehringer Ingelheim International GmbH*, 2018 WL 2337133, *4 (D. Del. May 23, 2018) (denying motion to quash third-party subpoena where "[t]he burden of production seems proportional to the stakes in this case.").  Here, the stakes are high—implicating the rights of Florida's 14 million voters who cast ballots for dozens of different offices. And Heritage holds information that cannot be readily garnered from any other sources.

Heritage protests that "plaintiffs could more easily obtain the documents sought . . . through discovery on the Defendants or requests filed under Florida's Sunshine Law."[36]  There is no foundation for that assertion.  First, nothing obligates Plaintiffs to seek the requested information from other non-parties (*e.g.*, the legislators) as a

---

[35] Press Release, *Florida Lawmakers Must Act to Protect Elections From Outside Influence*, Heritage Action for America, April 26, 2021, https://heritageaction.com/press/florida-lawmakers-must-act-to-protect-elections-from-outside-influence/.

[36] Ex. F, at 5.

prerequisite for obtaining documents from Heritage.    Second, neither the Florida Legislature nor any individual legislators are defendants in the Underlying Case.  Even if Plaintiffs wanted to name the legislators as parties, they likely could not do so since a defendant in a case such as the Underlying Case must "have some connection with *enforcement* of the provision at issue."[37]   Third, it is far more efficient for Heritage to produce the requested documents than for Plaintiffs to propound third-party subpoenas on legislators and their staff.  There are 160 state legislators and a significant number of legislative staff, many of whom may have communicated with Heritage.  Even if legislators did not or could not assert legislative immunity over such records, it is far more efficient (and less costly) to obtain those communications from a single source—Heritage—than to propound discovery demands on a significant number of parties.

Heritage's invocation of the "Sunshine Law,"[38] is also inapt.  For one, the Florida Sunshine Law, Section 286.011, Fla. Stat., deals with open public meetings, not public records.  Assuming that Heritage meant to refer to Florida public records law, Plaintiffs have sought (and continue to pursue) available information from the Florida House of Representatives and Florida Senate under Florida state law,[39] seeking records from a subset of legislators.  Despite Plaintiffs' repeated follow-up communications efforts, these public record requests are still pending.  To date, Plaintiffs have received no documents from the Florida House, and only today (September 27, 2021) received documents from the Florida Senate relating to a handful of senators.  The rapid pace of this case, including

---

[37] In a suit seeking to declare a state statute unconstitutional and enjoin its enforcement, the state official sued must "have some connection with enforcement of the provision at issue."  *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998).  In other words, to be a proper defendant, the state official must generally have some "enforcement mechanism."  *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1299 (11th Cir. 2019); *see also Jacobson v. Fl. Sec. of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) ("To be a proper defendant under *Ex parte Young*—and so avoid an Eleventh Amendment bar to suit—a state official need only have 'some connection' with the enforcement of the challenged law.").

[38] Ex. F, at 5.

[39] Art. I, § 24, Fla. Const.

impending discovery and summary judgment deadlines, requires the quick disclosure of these documents.  Further, to obtain documents from only 15 legislators, Plaintiffs will incur more than $9,000 in "extensive use fees."[40]

## IV.   Plaintiffs' Targeted Requests Do Not Impose Undue Expenses or Burdens on Heritage.

Finally, Heritage can comply with Plaintiffs' targeted requests without incurring undue expenses or burdens.  Heritage vaguely asserts in its Objections that complying with Plaintiffs' requests would "create undue burden and expense."[41]   Heritage's boilerplate objection provided no specifics to support its claim of an excessive cost or burden.

"[N]on-party status" is just one of several factors "considered by the court in weighing the burdens imposed in providing the requested discovery." *Ubiquiti Networks, Inc. v. Kozumi USA Corp.*, 295 F.R.D. 517, 521 (N.D. Fla. 2013) (quoting *Cytodyne Techs., Inc. v. Biogenic Techs., Inc.*, 216 F.R.D. 533, 535 (M.D. Fla. 2003)).  In any case, Heritage can run, with minimal expense and effort, electronic searches of emails and records sufficient to respond to Plaintiffs' targeted requests.  While every third-party subpoena necessarily creates *some* burden to the recipient, the burdens should be particularly light here, because Heritage entities are large, sophisticated parties,[42] and because most responsive documents may be in centralized locations.  Moreover, Plaintiffs' targeted requests were crafted to minimize needless burden.  Plaintiffs voluntarily narrowed the date range of its requests in response to Heritage's request.  Plaintiffs also offered to further negotiate specific search terms and date ranges—an offer rebuffed by Heritage, which refused to produce any documents at all.  As a result, Plaintiffs now seeks the

---

[40] *See* Ex. J.

[41] Ex. F, at 1.

[42] Public IRS filings indicate that, for the fiscal year ending in December 2019, The Heritage Foundation has more than $122 million in total revenue, and HAFA had more than $11 million in total revenue. *See* NonProfit Explorer: Heritage Foundation, ProPublica, https://projects.propublica.org/nonprofits/organizations/237327730, NonProfit Explorer: Heritage Action for America, ProPublica, https://projects.propublica.org/nonprofits/organizations/272244700.

assistance of this Court in compelling the production of an even narrower subset of Heritage's documents—responsive communications to or from Heritage and to or from any government officials or their staff, acting in their official capacity, from January 1, 2019 to the present.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter an order enforce the subpoenas and compel Heritage to produce the subset of responsive documents identified above.

Dated: September 27, 2021                    Respectfully submitted,

P. Benjamin Duke*
Shira M. Poliak**
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
212-841-1270
pbduke@cov.com

Robert D. Fram*
Covington & Burling LLP
415 Mission Street
San Francisco, CA 94105
415-591-7025
rfram@cov.com

Michael Pernick*
Morenike Fajana*
NAACP Legal Defense & Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
212-965-2200
mfajana@naacpldf.org

s/ Benjamin L. Cavataro
Benjamin L. Cavataro (Fla. Bar No. 113534)
Morgan E. Saunders*
Elizabeth T. Fouhey*
Michael A. Fletcher II*
Covington & Burling LLP
850 Tenth Street, N.W.
Washington, DC 20001
202-662-5693
bcavataro@cov.com
msaunders@cov.com
efouhey@cov.com
mfletcher@cov.com

Amia Trigg*
Mahogane D. Reed*
NAACP Legal Defense & Educational Fund, Inc.
700 14th Street NW, Ste. 600,
Washington, DC 20005
202-682-1300
atrigg@naacpldf.org

Nellie L. King (Fla. Bar No. 0099562)
The Law Offices of Nellie L. King, P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL 33401
561-833-1084
Nellie@CriminalDefenseFla.com

* Admitted *pro hac vice* in the Underlying Case in the Northern District of Florida
** Motion for admission *pro hac vice* forthcoming in the Underlying Case in the Northern District of Florida

*Counsel for Plaintiffs NAACP of Florida, Common Cause, and Disability Rights Florida*

16

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed on the Court's CM/ECF system on September 27, 2021, and that non-parties Heritage Foundation and Heritage Action for America were served by email.

s/ Benjamin L. Cavataro

*Counsel for Plaintiffs*